.WELLOCK *v.* BINKLE.

1. PARTNERSHIP—REPLEVIN—BILL OF SALE—CONSIDERATION—QUESTION FOR JURY.

In replevin for a stock of goods, a bill of sale of which had been given by a partnership to plaintiff as trustee to secure any indebtedness it might be owing to a bank through the defalcation and juggling of the bank's books in favor of the partnership by the cashier, a son of one of the partners, evidence on the part of plaintiff that the partnership was largely indebted to the bank at the time the bill of sale was given, although the bank's books showed that it had a small balance, *held*, to present an issue for the jury upon which they should have been fully and fairly instructed.[1]

2. SAME—EVIDENCE—DIRECTED VERDICT.

Although one of the partners at first denied the existence of a partnership between the defendants, and also denied that he signed the bill of sale, where he later admitted both, *held*, that the trial court should have instructed the jury that said partner signed the bill of sale, and that, as to plaintiff, defendants were partners, instead of submitting said questions to the jury.[2]

Error to Sanilac; Houghton (Samuel G.), J., presiding. Submitted June 6, 1924. (Docket No. 49.) Decided October 6, 1924.

Replevin by Robinson Wellock, trustee, against Philip Binkle and Adam W. Cowan, copartners as Cowan & Binkle, for possession of a stock of merchandise. Judgment for defendants. Plaintiff brings error. Reversed.

*Wilbur J. Beach (Lincoln Avery,* of counsel), for appellant.

*C. F. Gates,* for appellees.

[1]Replevin, 34 Cyc. p. 1521; [2]Id., 34 Cyc. p. 1520.

STEERE, J.   This is an action in replevin involving right to possession of a stock of merchandise for which plaintiff as trustee held a bill of sale executed by defendants as security for indebtedness to the State Bank of Harbor Beach, the real party in interest on plaintiff's side.   The parties were before this court in a preliminary proceeding involving this and other litigation (*Wellock* v. *Cowan,* 221 Mich. 58) where the conditions out of which such litigation arose are briefly summarized.   The property taken by the sheriff under his writ was, as shown by the inventory, valued by the official appraisers at $13,782.38.   Plaintiff declared in replevin and defendants pleaded formally in denial, with special notice of counterclaims for alleged damages to their credit and business, claimed to have been destroyed by the seizure of the stock of merchandise in which they were dealing.   The case was tried by jury.   Defendants waived return of the property and had verdict and judgment in their favor for $15,807.49.

Defendant Philip Binkle is an old resident of Harbor Beach, where he owned a store and was in business for many years.   He is the father of Henry Binkle, who was cashier of the State Bank of Harbor Beach.   The latter's defalcations and forgeries as such cashier gave rise to this proceeding.   Adam W. Cowan, the other defendant, is a brother-in-law of Henry and son-in-law of Philip Binkle.   In 1907 Cowan and Philip Binkle started business in the village of Deckerville, under the name of Cowan & Binkle, Philip giving his financial support and name to the enterprise.   Cowan resided there and had charge of the business while Philip continued to reside in Harbor Beach and conduct his own business there, occasionally visiting Deckerville. Cowan & Binkle started in business with a harness store and later expanded to a general hardware and implements business, also dealing in horses which were

bought by or under Cowan's directions and at times shipped by him to outside markets in car load lots. The latter line reached prominent proportions during the time of high prices and market activity resulting from the recent war, as indicated by the commercial paper handled by Henry Binkle as cashier after that account was transferred to the Harbor Beach bank. Of their banking connections Cowan testified that he first opened the account of Cowan & Binkle with the State Bank of Deckerville, but later drew the account from that bank "and did business with the Philip Binkle & Co. bank while they were in business in Deckerville." He afterwards took the "horse account" to Harbor Beach, and states that he had an agreement with his brother-in-law, Henry Binkle, who was cashier of the State Bank of Harbor Beach to cash checks as they came in, asserting however that

"Henry Binkle had no authority to draw checks on Cowan & Binkle.  *  *  *

"Q. Will you say that he did not draw checks to pay bills of Cowan & Binkle nearly all the time you did business with that bank?

"A. I will not.  I do not know anything about it."

Of this Philip Binkle was asked and answered in part as follows:

"Q. What will you say about Henry having authority to draw these checks?

"A. He had authority; there is no question about it.  *  *  *

"Q. Just tell the jury how the Cowan & Binkle business was handled there in the bank.

"A. Why, Henry drew checks for horses and signed drafts—he did it right along since we handled the horse business.

"Q. All the time you were handling the horse business through the State Bank of Harbor Beach?

"A. Yes, I took checks he made out and handed them to customers that fetched horses."

228—Mich.—37.

Early in 1920 it was first discovered by a State bank examiner that cashier Henry Binkle was a defaulter, as at first supposed to the amount of about $35,000, but which on further investigations increased to $90,000. When the State examiner first discovered the cashier's irregularities and shortage he called in the directors of the bank and informed them of the situation, Philip and Henry Binkle being present when their meeting was held. Plaintiff's testimony discloses that the checking account of Cowan & Binkle on the books of the bank showed at that time a credit of $88.85, but it was discovered that Henry Binkle was carrying in a drawer as cash items checks of Cowan & Binkle which he had paid as cashier and not charged to their account, to an amount of over $20,000.

Plaintiff claimed and introduced testimony to show that to maintain a credit in Cowan & Binkle's checking account Henry had credited it with many thousand dollars by juggling the bank liabilities, credits and books in various ways, such as forging and crediting notes and checks, making false entries against others, crediting to their account payments and deposits made to the bank by other depositors, etc., showing when finally traced out through the vouchers and records of the bank a claimed indebtedness of defendants to the bank of about $25,000, in addition to the checks found carried in a drawer as cash items and paid by the bank. The directors when notified by the examiner met at the bank on February 2, 1920. Philip and Henry Binkle were there, but Cowan was not. Dr. Atkinson, an old stockholder, who was present testified that Philip Binkle was the first person who spoke to him of the discovered shortage and said to him "the bank won't lose a cent. * * * We put up securities to make good," and showed him a list of the proposed securities they would turn over to the bank, which included the stock of goods of Cowan & Binkle at Deckerville.

Philip Binkle executed the bill of sale in issue here at that meeting and the board of directors adopted a resolution in his presence containing a declaration of trust with plaintiff as trustee which was spread upon its records, showing amongst other things that the bill of sale was taken as security for defendants' indebtedness to the bank.    It is dated February 2, 1920, states it is for a valuable consideration, names "Philip Binkle and Adam W. Cowan comprising the firm of Cowan & Binkle" as grantors and was then signed by Philip Binkle, "Cowan & Binkle," underneath which he wrote "P. Binkle."    It was taken the following day to Deckerville where Cowan signed it at the Commercial Bank.    It bears the names of two subscribing witnesses and attached to it is the following affidavit with indorsement of filing:

"State of Michigan, County of Sanilac, ss.
"Philip Binkle and Adam W. Cowan, being duly sworn, deposes and says that we are the vendors named in the within bill of sale, that he has knowledge of the facts and that the consideration of said instrument was actual and adequate, and that the same was given in good faith for the purposes therein set forth.
                              "PHILIP BINKLE,
                              "A. W. COWAN.
"Subscribed and sworn to before me this 3d day of February, 1920.
                              "J. A. HENNESSY,
                    "Notary Public, Sanilac county, Mich.
                    "My commission expires Apr. 5, 1921.
"Filed Feb. 5, 192.. at 1.15 p. m.
                              "J. F. CASWELL, Clerk."

Possession of the property it covered was left with Cowan & Binkle at Deckerville where they continued their business as before until the following October, when plaintiff made demand for its possession which was refused by Cowan, who was in charge, and this action followed.

That Henry Binkle as cashier of the bank was a defaulter to the extent of $90,000 is not disputed.    His

testimony as well as the records show, as plaintiff claims, that much of it was diverted to keeping defendants' horse account on the credit side of the ledger. This defendants deny and their counsel contends that they were neither in any way responsible for the shortage nor do they owe the bank anything. The latter claim appears to be based on the admitted facts that according to the books of the bank kept by Henry the account of Cowan & Binkle was not overdrawn but showed a balance in their favor of $88.85 while checks and vouchers representing returns for horses shipped to eastern market were introduced upon the trial showing funds deposited by them with the bank amounting to $446,529.21, which their counsel says "we should have credit for and they meet that by showing withdrawals of less than $50,000 and many of them forged." These vouchers were not questioned by plaintiff but it was shown, as plaintiff claimed, by the books and records of the bank when properly checked, that defendants had received credit on their checking account for all of those vouchers and many more, the total amount to their credit being $501,873.28, with no vouchers or other evidence to account for the difference.

It need only be said here that conceding defendants' denial of any indebtedness to the bank made that an issue of fact, there was abundant testimony introduced by plaintiff which if believed made a *prima facie* case on that issue upon which the jury should have been fully and fairly instructed. Plaintiff's counsel contend that this was not done, and assign error on failure of the court to fairly and squarely submit to the jury the question, and their theory, of Cowan & Binkle's indebtedness to the bank.

Early in the charge, while stating the nature of the case and claims of the parties, the court said:

"Before I go further I might also say to you that the plaintiff further claims and you have heard the

testimony—whether there is any testimony or not to that question—they claim in addition to the bill of sale being given as security, that it was known and understood by the parties to that paper that when it was given—that Cowan & Binkle had received moneys from the bank far in excess of the amount involved in that bill of sale and that it was given to make up their own shortage as well as to protect and to make up the shortage of the—not to make up their shortage, but to pay back what they had actually received from the bank and to protect the shortage of Henry Binkle."

Having interjected into the case a doubt as to "whether there was any testimony or not," to support plaintiff's claim, the court further said as to the security:

"I say to you that there is some testimony by Adam Cowan, I believe, some testimony in the case, I think Mr. Cowan gave it, that he was in business and he used Mr. Binkle's name to aid him in credit, or to aid him in some way in connection with his business, but he and Mr. Binkle were not partners. As between himself and his creditors, if they held themselves out as partners they would be treated as partners for all debts that were contracted in connection with their partnership business and each could contract debts for the copartnership in their partnership business, but neither could sign a paper to bind the other for something outside and foreign to the partnership business as in this case. If Mr. Binkle assigned this stock over to the bank as security and Adam Cowan did not sign it, he could not transfer that property without Adam Cowan. That is the reason why I call your attention to the idea of the partnership association and how they could bind one another in this connection, because there is testimony here that Adam Cowan did not know whether he signed the bill of sale or not. If he signed the bill of sale—if you find from the testimony that Adam Cowan signed the bill of sale, then the execution of that paper is properly executed and does constitute a bill of sale for the purposes mentioned in this case from Cowan & Binkle to the bank. If Adam Cowan did not sign it then of course it would not do that. I say, you have here the testimony.

It is for you to determine whether or not they were partners and whether or not if they were, if he signed this paper."

The positive instruction near the close of this paragraph that "if Adam Cowan did not sign it then of course it would not do that," was at least a confusing assertion in the connection used and amounted in effect to telling the jury that the bill of sale signed in the firm's name by Philip Binkle would only secure his own debts, being "something outside and foreign to the partnership's business *as in this case.*" (The italics are ours.)

Near the close of the charge, after having squarely submitted to the jury as issues of fact the question of whether Cowan and Philip Binkle were partners, and whether Cowan signed the bill of sale, the court further said:

"If Adam Cowan did not sign this paper your verdict would be the same (not guilty). It would not be binding on him. * * *

"And if you find that is true, that they were not given as security for the defalcation of Henry Binkle, the defendant is entitled to a judgment at your hands of thirteen thousand—the amount that was given to you, with five per cent. from the 11th day of October, 1920."

Plaintiff's oral and written evidence unquestionably made a *prima facie* case of the Cowan & Binkle's indebtedness to the bank, as the court recognized before plaintiff rested. While the bank examiner who discovered the shortage was testifying a discussion arose over a claim by plaintiff's counsel regarding Cowan & Binkle being liable under certain named exhibits, when defendant's counsel asserted, "That is not admitted. The reverse of it is true," and the court replied:

"I said they had introduced evidence to establish their claim. It is there. It is up to you to meet it.

If you do not meet it, then they have made a *prima facie* case."

The court should have so instructed the jury without confusing that issue by blending with it as issues of fact the questions of whether defendants were partners and Cowan signed the bill of sale.    It is true that Cowan early in his testimony essayed to deny the partnership and said he did not remember signing the bill of sale, but before his examination was concluded he admitted both.    As this record stands it is not a case open to the rule that where a witness makes contradictory statements the jury may decide which is true.    When the bill of sale was produced he was shown his signature to it, with questions and answers as follows:

"*Q.* Is that your signature at the bottom of the paper?
"*A.* Yes, that is.
"*Q.* You signed it there?
"*A.* I don't know.
"*Q.* You are sure that is your signature on it?
"*A.* Yes.    *    *    *
"*The Court:*    *Q.* You wrote your own name there?
"*A.* Yes."

When counsel for plaintiff pressed the subject, showing Cowan a mortgage which he admitted signing, his counsel objected to it as prejudicial, saying, "There is no signature that is material in this case that is disputed.    There is nothing in this issue that is in dispute regarding signatures."    Later in the trial, when the question came up again and the court asked, "Do I understand that this witness (Cowan) in his testimony said he had not signed the chattel mortgage or bill of sale?" counsel for defendant said, "We are not claiming that he did not actually sign the bill of sale?"    Later when asked by his counsel, "*Q.* Did you rely at the time you gave this instrument upon their promise that Henry Binkle should

remain in the bank until the shortage was made up and the papers returned to you?" Cowan replied, "I did."

Upon the question of partnership, plaintiff and the bank he represented were third parties.   There was abundance of undisputed evidence to establish a partnership as to third parties, whatever understanding they may have had as to it between themselves.   A certificate of copartnership in regular form "under the firm name of Cowan & Binkle, located at Deckerville, State of Michigan," giving the names and residence of the copartners and filed with the county clerk was put in evidence.   The required affidavit attached has the name "Adam W. Cowan, one of the copartners of the above firm," beneath it as affiant, followed by "Subscribed and sworn to before me this first day of Nov. A. D. 1913.   Carl W. Binkle, Notary Public."   Indorsed on the back appears: "Certificate of copartnership, 164 Public Acts 1913, Name of firm: Cowan & Binkle, Deckerville, Michigan.   Filed by A. W. Cowan," underneath which is stamped "Filed November 4, 1913.   Sanford L. Utley, clerk of said county."   Confronted with this Cowan denied signing or filing it.   Carl W. Binkle, the notary, was his brother-in-law, employed in the Commercial Bank at Deckerville where Cowan & Binkle did business. Cowan, who came the nearest of any witness to denying a partnership testified in part:

"I live in Deckerville, have for 15 years, have been running business there under the name of Cowan & Binkle since 1907; * * * No one was interested in the goods in that business at the time except myself and Philip Binkle.   The business was conducted there under the name of Cowan & Binkle from 1907 to 1920. * * * a few years after starting we went into hardware; we handled machinery, farm machinery, wagons and buggies.   I dealt quite a little in horses; * * *

"*Q*. Now during the time that you did business in

Deckerville from 1907 up until February 2, 1920, you and Philip Binkle were partners, were you not?

"*A.* Not that I know of.

"*Q.* You never knew you were partners.

"*A.* No, sir.    *    *    *

"*Q.* You always did business under the name of Cowan & Binkle?

"*A.* Yes.

"*Q.* How were your checks drawn up, blank checks?

"*A.* Cowan & Binkle.    *    *    *    When I bought horses I gave checks for them signed Cowan & Binkle.

"*Q.* Why did you sign them Cowan & Binkle if you were not partners?

"*A.* I told you once that was the way we signed our checks, Cowan & Binkle.    *    *    *    Any checks that I drew were signed Cowan & Binkle.    *    *    *

"*Q.* Did Philip Binkle draw many checks on your account?

"*A.* I do not know.    Philip Binkle was not at Deckerville much"—

Philip Binkle testified as to the partnership in part:

"*Q.* You are one of the firm of Cowan & Binkle conducting business at Deckerville?

"*A.* That is what they claim.    I started in business in Deckerville in 1907.    I think—the business was conducted under the name of Cowan & Binkle until February, 1920.    *    *    *

"*Q.* While in business there did you make any profits with the defendant?

"*A.* No.

"*Q.* Did you have any losses?

"*A.* Yes, we got lots of losses.

"*Q.* Did you pay any of the losses?

"*A.* Why, yes.    *    *    *

"*Q.* And checks were issued by your firm in the name of Cowan & Binkle.

"*A.* Yes, I think we carried accounts in banks in that name and bought and sold· goods under that name.    *    *    *

"*Q.* Did you know that the firm was owing the bank at that time (when the bill of sale was given)?

"*A.* I know of a $700-note what I signed Cowan & Binkle that was not paid."

We do not find in the record any evidence showing direct denial of a partnership or claim that there was none, at least in so far as outside or third parties were concerned. When Cowan was giving direct testimony and a discussion arose in which that subject was mentioned defendants' counsel said:

"We do not claim any benefit. * * * It has no bearing. All it is put in here for is simply for the question of weighing evidence and claiming no legal effect whether they are partners or not partners."

Upon defendants' own testimony the court should have instructed the jury that Cowan signed the bill of sale and as to plaintiff Cowan & Binkle were partners.

For the foregoing reasons the judgment must be reversed and a new trial granted, with costs to plaintiff.

McDONALD, BIRD, SHARPE, MOORE, FELLOWS, and WIEST, J., concurred. CLARK, C. J., did not sit.